Edward WEINTRAUB et al., Plaintiffs,

v.

RURAL ELECTRIFICATION ADMINIS-
TRATION, U. S. DEPARTMENT OF
AGRICULTURE, et al., Defendants.

Civ. No. 78-544.

United States District Court,
M. D. Pennsylvania.

July 18, 1978.

As Corrected Nov. 3, 1978.

**80**

Norman J. Watkins, Bart DeLuca, J. Justin Blewitt, Jr., Deputy Attys. Gen., Robert P. Kane, Atty. Gen., Dept. of Justice, Arnold B. Kogan, Historic Harrisburg Ass'n, Inc., Harrisburg, Pa., for plaintiffs.

John R. Zonarich, Harrisburg, Pa., Harry A. Nagle, Lewisburg, Pa., Paul J. Killion, Harrisburg, Pa., for defendants.

### OPINION

MUIR, District Judge.

#### I. Introduction.

The Plaintiffs Edward Weintraub, director of the Office of Historic Preservation for the Pennsylvania Historical Museum Commission, and the Historic Harrisburg Association, Inc., brought this action pursuant to 28 U.S.C. § 1331, the general federal question jurisdictional statute, alleging that the Defendants, the Rural Electrification Administration of the United States (REA), the Telegraph Building Corporation (TBC), the Association Building Corporation (ABC), and the Allegheny Electric Cooperative, Inc. (AEC) have violated 16 U.S.C. § 470f by planning to and beginning the demolition of the Telegraph Building which is located at 214–216 Locust Street, Harrisburg, Pennsylvania.

On March 3, 1978, the Secretary of the Interior placed the Telegraph Building on the National Register of Historic Sites. 16 U.S.C. § 470f [1] requires that the head of any federal agency having direct or indirect jurisdiction over a proposed federal or federally assisted undertaking in any state and the head of any federal department of independent agency having authority to license any undertaking shall prior to the approval of the expenditure of any federal funds on the undertaking or prior to the issuance of any license take into account the effect of any undertaking on any district, site, building, structure, or object that is included in the National Register. In addition, the National Advisory Council, is to be given an opportunity to comment on the action. The Defendants maintain that the demolition of the Telegraph Building does not involve federal funds or the issuance of any federal license. On June 8, 1978, the Plaintiffs requested that the Court grant a temporary restraining order to prevent the demolition of the Telegraph Building. After a hearing which lasted approximately 2½ hours, the Court denied that request. On June 19, 1978, the Plaintiffs filed an amended application for a temporary restraining order to prevent the demolition of the Telegraph Building. On June 21, 1978, beginning at approximately 4:30 P. M. and ending at 8:15 P. M. the Court held another hearing concerning the issuance of a temporary restraining order. The Court denied the motion for the issuance of a temporary restraining order because it found that there was not enough federal action to require the application of 16 U.S.C. § 470f. On June 29 and June 30, 1978, July 3, July 7, and July 8, 1978, the Court heard testimony concerning the Plaintiffs' motion for a preliminary injunction. The Plaintiffs refused

1. 470f reads as follows:

"The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal Agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470n of this title a reasonable opportunity to comment with regard to such undertaking."

to have the hearing for a preliminary injunction consolidated with the hearing for a permanent injunction. The Court interrupted hearing testimony in this case on July 6 and 7 to hold pretrial conferences and to select juries for cases on its July, 1978 Harrisburg trial list. The following are the Court's findings of fact, discussion, and conclusions of law.

## II. Findings of Fact.

1. Plaintiff Edward Weintraub is the Director of the Office of Historic Preservation for the Pennsylvania Historical and Museum Commission. (Undisputed)

2. The Pennsylvania Historical and Museum Commission is an agency of the Commonwealth of Pennsylvania. (Undisputed)

3. Plaintiff Weintraub, by virtue of a gubernatorial appointment, also serves as the State Historical Preservation Officer. (Undisputed)

4. Plaintiff Historic Harrisburg Association, Inc. is a non-profit Pennsylvania corporation having its mailing address at P.O. Box 951, Harrisburg, Pennsylvania, 17108. (Undisputed)

5. The corporate purposes of plaintiff Historic Harrisburg Association, as set forth in its corporate charter, are as follows:

"(a) To promote community participation, cooperation, interest and goodwill among residents and property owners in the City of Harrisburg, Pennsylvania; and

"(b) To preserve, maintain and enhance through all available means the aesthetic and wholesome character of Harrisburg's neighborhood environments; and

"(c) To maintain where possible and restore where necessary those elements of Harrisburg's manmade and natural environment which are deemed to possess historic, cultural, or civic value; and

"(d) To cooperate with the City of Harrisburg and other public and private bodies in the reconstitution of neighborhoods for residential and residentially compatible uses." (Undisputed)

6. Plaintiff Harrisburg Historic Association, Inc. has among its members property owners and residents within "Historic Harrisburg". (Undisputed)

7. The Telegraph Building is located within the immediate vicinity of Historic Harrisburg.

8. The Telegraph Building was listed on the National Register by the Secretary of Interior on March 3, 1978. (Undisputed)

9. The demolition of the Telegraph Building and the establishment of a parking lot in place of said building will affect the aesthetic and environmental values of Harrisburg.

10. Defendants Telegraph Building Corporation (TBC) and Association Building Corporation (ABC) are closely held corporations.

11. ABC was incorporated with an authorized capital of 2500 shares having a par value per share of which two shares are issued and outstanding, one owned by AEC and one owned by PREA.

12. The property numbered 214–216 Locust Street, Harrisburg, Pennsylvania, is commonly referred to as the Telegraph Building. (Undisputed)

13. The property numbered 212 Locust Street, Harrisburg, Pennsylvania, is commonly referred to as the Locust Court Building. (Undisputed)

14. Defendants TBC and ABC purchased the Telegraph Building in conjunction with their development of the Locust Court Building. (Undisputed)

15. TBC and ABC have entered into a contract with Swatara Contractors, Inc., in order to accomplish their intent to demolish the Telegraph Building. (Undisputed)

16. On or about September 23, 1977, the Defendants TBC and ABC were issued a permit by the City of Harrisburg allegedly authorizing them to demolish the Telegraph Building. (Undisputed)

17. The demolition permit mentioned in the preceding paragraph was to expire on June 15, 1978. (Undisputed)

18. The demolition of the Telegraph Building was to commence on May 22, 1978. (Undisputed)

19. On May 22, 1978, the City of Harrisburg issued to Defendants TBC and ABC a "Stop Work Order" directing said Defendants to cease all work in connection with the demolition of the Telegraph Building. (Undisputed)

20. On or about May 23, 1978, Defendants TBC and ABC filed suit in the Court of Common Pleas, Dauphin County, Civil Docket No. 3720, 1978, against the City of Harrisburg and City officials, requesting that the Court order the dissolution of the "Stop Work Order" and that the City be permanently enjoined from interfering with the demolition of the Telegraph Building. (Undisputed)

21. On or about May 25, 1978, Judge Lipsitt of the Dauphin County Court of Common Pleas, the presiding judge in the case listed at Civil Docket No. 3720, 1978, issued a preliminary injunction and ordered (a) that the demolition permit which was to expire as of June 15, 1978, remain valid until such time as the Common Pleas Court had the opportunity to decide the claims asserted in the lawsuit and (b) that if said claims are resolved favorably to TBC and ABC that the demolition permit remain valid for a reasonable period of time so that TBC and ABC can effectuate the demolition of the Telegraph Building. (Undisputed)

22. The City of Harrisburg on June 7, 1978, revoked the "Stop Work Order."

23. The demolition of the Telegraph Building commenced on June 8, 1978. (Undisputed)

24. This Court issued a temporary restraining order (TRO) enjoining the demolition of the building at 3:49 p. m. on June 8, 1978 at the beginning of the first hearing on the application for a TRO when the Court was advised that demolition of the building had commenced just minutes before.

25. The aforementioned TRO was lifted at approximately 7:00 p. m. on June 8, 1978,
at the conclusion of the hearing because the Court was not convinced that the Plaintiffs were likely to prevail on the merits.

26. The City of Harrisburg issued a Stop Work Order on June 8, 1978, against Swatara Contractors, Inc., agents of ABC, TBC, and AEC to cease demolition of the building because the health and safety of a tenant in the front portion of the building was being affected by the demolition. (Undisputed)

27. All tenants vacated the Telegraph Building by June 12, 1978.

28. The conditions supporting the issuance by the City of Harrisburg of the June 8, 1978 Stop Work Order are no longer in existence. (Undisputed)

29. The demolition of the building is imminent.

30. The building is being stripped, windows are left open, and final preparation for demolition is taking place. (Undisputed)

31. Defendant Association Building Corporation, Inc. (ABC) is a Pennsylvania business corporation owned fifty percent (50%) by Defendant Allegheny Electric Cooperative, Inc. (AEC) and fifty percent (50%) by Pennsylvania Rural Electric Association. (PREA).

32. AEC is a federation of all 12 Pennsylvania Rural Electrification Administration (REA) borrowers, Sussex Rural Electric Cooperative (Sussex, New Jersey), and one non-REA borrower.

33. AEC is a Pennsylvania non-profit corporation with its principal place of business in Harrisburg, Pennsylvania organized in 1946 as a tax exempt cooperative under § 501(c)(12) of the Internal Revenue Code to allow the local cooperatives to purchase electricity on a larger wholesale basis than was possible formerly when each cooperative negotiated with the private utility companies or investor-owned utilities on an independent basis. (Undisputed)

34. AEC has "all requirements" wholesale power contracts with its 14 members extending through 2025. (Undisputed)

35. Prior to January of 1978, when AEC acquired a participation interest in the Susquehanna Steam Electric Station, AEC did not own any generation or transmission facilities. (Undisputed)

36. Prior to January, 1978, AEC met all of its members' power and energy needs through purchase arrangements with 5 power suppliers. (Undisputed)

37. Defendant Telegraph Building Corporation, Inc. (TBC) is a Pennsylvania business corporation which owns the Telegraph Building, the property in controversy. (Undisputed)

38. TBC is owned by Locust Court Associates, Inc. (LCA). (Undisputed)

39. LCA is a Pennsylvania business corporation and owns all of the stock of the Telegraph Building Corporation.

40. LCA is owned by ABC.

41. PREA is a Pennsylvania non-profit corporation and is a coordinator and member service organization for Pennsylvania's rural electric cooperatives. (Undisputed)

42. The Defendant Rural Electrification Administration (REA) is an agency within the United States Department of Agriculture. (Undisputed)

43. REA provides direct loans at interest rates of 2% to 5% to rural electric cooperatives.

44. REA guarantees loans for the construction of large-scale electric power plants.

45. REA has lent and is currently lending substantial sums to all of AEC's members with the exception of one.

46. On August 12, 1977, REA made a commitment to guarantee a loan by the Federal Financing Bank (FFB), an instrumentality and wholly owned corporation of the United States, in the amount of $241,-408,000.00 to AEC to finance a 10% participation interest in Susquehanna Station.

47. On December 15, 1977, Reuben Yoselson, President of AEC, executed a mortgage to the United States, a loan contract dated as of July 29, 1977 between AEC and the United States of America, and a mort-

gage note to FFB dated as of August 16, 1977. (Undisputed)

48. The National Rural Utilities Cooperative Finance Corporation (CFC) is a non-profit corporation.

49. CFC provides supplemental financing for the rural electrification program.

50. CFC provided a two-year $1,000,000 loan to AEC to build Locust Court Building.

51. Commonwealth National (CNB) was the lead bank in providing funds for a mortgage to ABC to construct the Locust Court Building.

52. Dauphin County Industrial Development Authority (DCIDA) provided tax exempt financing to build the Locust Court Building.

53. DCIDA provided a $2,500,000 lease-purchase financing to ABC to construct the Locust Court Building.

54. The financing of the Locust Court Building was accomplished by a consortium of banks headed by Commonwealth National Bank in which AEC's members maintained deposits.

55. CNB provided a $2,500,000 loan to ABC and DCIDA for the Locust Court Building.

56. AEC provided a $3,800,000 mortgage to ABC and DCIDA to finance the construction and the operating losses of Locust Court Building.

57. The mortgage mentioned in the preceding paragraph is subordinate to the mortgage of DCIDA to the Commonwealth National Bank.

58. Consumer Life Insurance Company provided a $182,000 mortgage to the Telegraph Building Corporation to finance the acquisition of the Telegraph Building. (Undisputed)

59. The loan mentioned in the preceding paragraph was guaranteed by AEC, PREA, and LCA.

60. ABC guaranteed the mortgage loan granted to TBC with the hope of expediting the construction of a parking area to alleviate tenant parking difficulties at the Locust Court Building. (Undisputed)

61. As of December 31, 1972, when PREA and AEC were attempting to secure a loan for the building of their new headquarters, AEC had $274,345 in net capital (patronage capital) and donated capital of $6,400.

62. As of December 31, 1972, PREA was in a deficit position with a $16,541 deficit.

63. The Locust Court Building mentioned above was initially to cost $2,500,000 but by November 16, 1973 the project cost had increased to $3,000,000.

64. On May 13, 1974, a $500,000 increase for the construction of the Locust Court Building was approved by DCIDA and the project cost was now approved at $3,500,000, the last $500,000 increase not being funded by DCIDA financing.

65. On November 21, 1974, DCIDA authorized an increase of $100,000 to the project cost thus increasing the total cost to $3,600,000.

66. The Locust Court Building was financed from the following sources:

a. CFC lent $1 million to AEC to be used in the initial stages of acquisition of the State Theater Building site and demolition of the State Theater and construction of the Locust Court Building. This loan was repaid prior to the DCIDA loan described below. (Undisputed)

b. DCIDA lent $2.5 million to ABC with a guarantee of AEC through the 25 participating banks located throughout Pennsylvania. (Undisputed)

c. AEC gave ABC a $1.3 million mortgage for the construction of the Locust Court Building. (Undisputed)

d. AEC's Board committed itself to fund ABC in its initial stages and until such time as ABC is in a financial position to be self-sustaining. (Undisputed)

67. AEC and PREA are fully owned by approximately thirteen separate local rural electric cooperatives. These local cooperatives make up the membership of AEC and PREA and, with one exception, receive between 80% and 98% of their long-term capital loans from REA.

68. AEC and PREA became stockholders in the private Pennsylvania corporation of ABC in order to guarantee both organizations much needed office space and room for future expansion. (Undisputed)

69. The aforementioned cooperatives have as their major assets electrical transmission lines and generation equipment which are directly funded either wholly or substantially by loans from REA.

70. The financing through DCIDA was accomplished by a lease-purchase arrangement by which CNB, as the lead bank, lent to DCIDA which provided the money to ABC to construct the Locust Court Building.

71. AEC acts as a middleman for all the cooperatives in that AEC negotiates contracts to purchase power from power companies and then resells such power to its member cooperatives.

72. The member cooperatives purchase power from AEC which is sent through the lines and transmission equipment funded by REA.

73. The rates charged by AEC for the power it sells to its member cooperatives have allowed it to accumulate a substantial surplus of funds.

74. This surplus of funds has enabled AEC to:

a. Lend ABC $1.3 million for financing the Locust Court Project.

b. Absorb ABC's accumulated deficit of $553,128,

c. Pay off within the two-year period from 1976–1978 the loan of one million dollars ($1,000,000) that AEC received from CFC for financing the Locust Court Project and

d. Guarantee the repayment of two and a half million dollars to CNB.

75. REA has supervisory control over surplus revenues accumulated by cooperatives such as the members of AEC. Rural Electrification Program Bulletin, No. 1–7, August, 1969, revised December, 1977.

76. The member cooperatives through their ownership of AEC, PREA, and ABC own or control TBC.

77. TBC on February 1, 1978, borrowed $182,000 from the Consumer Life Insurance Co. secured by a mortgage recorded in Dauphin County Mortgage Book "I", Volume 55, Page 402 for the purchase of the Telegraph Building. (Undisputed)

78. AEC and all of its REA-borrower member cooperatives enjoy a non-profit tax exempt status under Section 501(c)(12) of the Internal Revenue Code.

79. ABC caused to be formed Locust Court Associates, Inc. a Pennsylvania business corporation, to purchase all of the stock of the Telegraph Building Corporation.

80. The purchase price of the Telegraph Building was initially "paid" by a note from ABC to the original stockholders of the Telegraph Building Corporation.

81. The Telegraph Building Corporation was at the time of the sale in a substantial loss situation.

82. The Locust Court Building is operating at a deficit.

83. A $500,000 loan was made by CNB to Lombardo's Restaurant in the Locust Court Building which was guaranteed by AEC.

84. The basis of AEC's guarantee, as set forth in the preceding paragraph, is the accumulated surplus from operating revenues received from its member cooperatives.

85. The parking facility which the Defendants seek to build on the site of the Telegraph Building is to serve the patrons of Lombardo's Restaurant and the tenants of the Locust Court Building.

86. ·AEC purchases a large percentage of its power from the Power Authority of the State of New York (PASNY).

87. AEC purchases its power from PASNY based on criteria established by an Act of Congress. 16 U.S.C. § 836.

88. PASNY's rates per kilowatt hour are low because the electricity is hydroelectricity generated by natural water falls at Niagara, New York. (Undisputed)

89. Less than 10% of AEC's power needs for 1976 was purchased from investor owned utilities at a rate of $1.81 per kilowatt hour.

90. Approximately 33% of AEC's power needs for 1976 was purchased at a rate of $3.63 per kilowatt hour.

91. AEC purchased 50% of its power needs for 1976 from PASNY at a rate of $.59 per kilowatt hour.

92. The Locust Court Building is the headquarters of AEC and PREA.

93. PREA is dependent upon its members for revenues.

94. The purchase of the Telegraph Building by ABC occurred on February 1, 1978.

95. ABC entered into a mortgage on February 1, 1978 to purchase the Telegraph Building.

96. ABC is operating at a loss.

97. In March, 1977, AEC entered into an agreement to purchase from Pennsylvania Power & Light Co. (PP&L) a 10% undivided ownership in the Susquehanna Nuclear Steam Generating Station now under construction by PP&L in Salem Township, Luzerne County, Pennsylvania.

98. The purchase mentioned in the preceding paragraph is being financed by a loan not to exceed $260 million by Defendant REA.

99. AEC's general funds as of December 31, 1976 consisted of $7,549,148.

100. AEC files detailed monthly and yearly operating reports with REA on REA form 12–A.

101. The reports mentioned in the preceding paragraph have been filed with REA during the years 1972–1977.

102. The demolition contract for the Telegraph Building provides for the demolition of the building at a cost of $62,500.

103. AEC has funded ABC which in turn has lent $210,000 to Lombardo's at Locust Court on an unsecured note receivable.

104. ABC purchased a 60% interest in Lombardo's at Locust Court, a high class luxury restaurant.

105. Lombardo's at Locust Court will pay $3,000 a month to Telegraph Building Corporation for parking on the Telegraph Building site.

106. AEC had only $41,980.00 in utility plant until 1977 when it became an REA borrower.

107. AEC now has a utility plant of at least $88,998,454 as a direct result of a REA loan guarantee of up to $260 million funded through the Federal Financing Bank, an instrumentality of the United States.

108. AEC first became an REA borrower on January 11, 1978 when it received funds from a mortgage which it executed on December 15, 1977 for $241,408,000.00 with REA guarantees in order to purchase a 10% interest in PP&L's Susquehanna Nuclear Power Steam Generating Plant.

109. On January 11, 1978, an initial advance of $89,298,000.00 was made in accordance with the Loan Contract. (Undisputed)

110. REA controls the use of its loan funds by: (1) making or guaranteeing loans only for the specific purposes detailed in the loan application submitted to REA by a borrower or potential borrower; (2) advancing loan funds only for the purposes detailed in a requisition from a borrower, and these purposes must conform to the purposes for which the loan was made or guaranteed; and (3) conducting an annual audit of the borrower's financial records to insure that the borrower used loan funds only for the approved loan purposes. (Undisputed)

111. The loan from REA to AEC was approved to finance the participation in the Susquehanna Station, and the approved loan purposes do not include any expenditures relating to the Locust Court Building or the Telegraph Building.

112. REA did not approve any usage of loan funds or general funds by AEC which would have directly or indirectly contributed to or assisted the proposed demolition of the Telegraph Building.

113. AEC notified REA before REA made its loan guarantee commitment that AEC and PREA had formed ABC to provide adequate office space for future operation, and that AEC and PREA had agreed to financially assist [sic] ABC until it was able to meet its financial obligation through its own operations. (Undisputed)

114. REA determined at the time it guaranteed the loan to AEC that AEC's financial commitments with respect to its office space would not affect the security of the guarantee of the loan. (Undisputed)

115. AEC, until it became a direct REA borrower, had no employees and contracted with PREA to obtain legal and accounting services.

116. Some outside legal services were obtained by AEC prior to the time it became a direct REA borrower. (Undisputed)

117. AEC was seriously negotiating the purchase of an interest in a nuclear power facility in 1973.

118. By May, 1975 AEC knew its nuclear power generating facility would probably be available for use by 1980.

119. AEC is owned by 14 rural electric cooperatives:

Adams Electric Co-Op., Inc.
Bedford Rural Electric Co-Op., Inc.
Central Electric Co-Op., Inc.
Claverack Electric Co-Op., Inc.
New Enterprise Rural Electric Co-Op., Inc.
Northwestern Rural Electric Co-Op., Inc.
Somerset Rural Electric Co-Op., Inc.
Sullivan County Rural Electric Co-Op., Inc.
Sussex Rural Electric Co-Op., Inc.
Tri-County Rural Electric Co-Op., Inc.
United Electric Co-Op., Inc.
Valley Rural Electric Co-Op., Inc.
Warren Electric Co-Op., Inc.

(Undisputed.)

120. Each AEC member cooperative reflects on its own balance sheet the patronage capital which it has been assigned by AEC.

121. All assets of REA borrowers (including AEC's member REA borrowers) have been pledged to REA.

122. The Harristown Development Corporation acting on behalf of the City of Harrisburg was authorized by a resolution of the Council of the City of Harrisburg, to offer Defendant ABC $250,000 for the purchase of the Telegraph Building.

## III. Discussion.

■ Before reaching the merits of this case, the Court must consider the motion to dismiss submitted by the Defendants on June 21, 1978 accompanied by a brief. On July 7, 1978, the Plaintiffs submitted a brief in opposition to Defendants' motion. First the Defendants contend that the Plaintiffs have not set forth the basis for subject matter jurisdiction. The Plaintiffs allege that this Court has jurisdiction over their claim pursuant to 28 U.S.C. § 1331 which states that the district courts shall have jurisdiction of all civil actions if the matter in controversy exceeds the sum or value of $10,000 exclusive of interests and costs and arises under the Constitution and laws or treaties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any agent, officer, or employee thereof in his official capacity. Because the Plaintiffs maintain that the Defendants have violated a federal statute, 16 U.S.C. § 470f, this claim arises under the laws of the United States. The Plaintiffs have plead an amount in controversy in excess of $10,000. The Defendants' contention that this assertion of $10,000 in damages on the part of each Plaintiff is speculative lacks merit. In *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), the Supreme Court was dealing with a similarly difficult-to-measure interest—the preservation of the purity of interstate waters. The Court declared that the considerable interest involved in the purity of interstate waters would seem to put beyond question the jurisdictional amount provided for in 28 U.S.C. § 1331(a). In *Save the Courthouse Committee v. Lynn*, 408 F.Supp. 1323 (S.D. N.Y.1975), the Plaintiffs contended that construction of an old courthouse deprived them of cultural and architectural interests in excess of $10,000. The Court stated that it can fairly be said that considerable interests are involved in the preservation of cultural resources and that would seem to put beyond question the jurisdictional amount provided for in § 1331(a). This Court concludes that the same result must be reached concerning the value of the Telegraph Building. The Secretary of the Interior of the United States has found that this building has sufficient architectural and historical value to warrant placing it on the National Register. Although the value of the Telegraph Building may be difficult of precise measurement, that difficulty does not make the claim non-justiciable under § 1331. The federal courts in injunction actions under § 1331 frequently are asked to protect such intangibles as the good will adhering to a trademark and the rights of free speech and free assembly. *Schering Corporation v. SunRay Drug Company*, 320 F.2d 72 (3d Cir. 1963); *Spock v. Davis*, 469 F.2d 1047 (3d Cir. 1972). These intangible interests are sufficiently capable of valuation to meet the jurisdictional requirement. There is no reason to lay down a rule of law that the cultural, historical, and architectural value of a building presents a non-justiciable problem of valuation. *Spock v. Davis*, 469 F.2d 1047 (3d Cir. 1972).

■ Because this case is brought against the Rural Electrification Administration of the United States Department of Agriculture, there is no $10,000 requirement. 28 U.S.C. § 1331(a). Jurisdiction against the other Defendants may be asserted because they are involved in the demolition of the Telegraph Building. If this Court issues an injunction, their actions will have to be restrained. Asserting jurisdiction over the nongovernmental Defendants in this case is similar to what often occurs in actions brought pursuant to the National Environmental Protection Act, 42 U.S.C. § 4332. The Courts have held that pursuant to that act they have the authority to enjoin the actions of state and local governments

where those governments are using federal funds to carry out activities which significantly affect the environment. *Biderman v. Morton*, 497 F.2d 1141, 1147 (2d Cir. 1974); *Silva v. Romney*, 473 F.2d 287, 289–290 (1st Cir. 1973); *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323, 1329 (4th Cir. 1972); *LaRaza Unida v. Volpe*, 337 F.Supp. 221 (N.D.Calif.1971); *Named Individual Members of San Antonio Conservation Society v. Texas Highway Department*, 446 F.2d 1013 (5th Cir. 1971); *Save the Courthouse v. Lynn*, 408 F.Supp. 1323 (S.D. N.Y.1975); *Athens Township Taxpayers League v. Alexander J. Greene, et al.*, (M.D.Pa. 3/31/78).

■ The Defendants contend that Edward Weintraub and the Historic Harrisburg Association, Inc. lack standing to bring this action. The requirement that a Plaintiff in a case in federal court show standing stems from two considerations. First is the requirement of Article III of the United States Constitution that federal courts decide only cases or controversies. This is the threshold question in every federal case because it determines the power of the court to entertain suit. Apart from this constitutional mandate, the Supreme Court has recognized other limits on the class of persons who may invoke the federal courts' decisional and remedial powers. *Warth v. Seldin*, 422 U.S. 490, 498, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). To demonstrate standing the Plaintiffs must show that the challenged action has caused them injury in fact and that the alleged injury is to an interest arguably within the zone of interest protected or regulated by the statutes that the federal agencies are claimed to have violated. *United States v. SCRAP*, 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). The injury in fact requirement can be met by showing harm to the aesthetic and environmental well-being of the Plaintiff. *United States v. SCRAP*, 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Historic Harrisburg Association has among its membership individuals who reside in the area of the Telegraph Building. They allege that the aesthetic and cultural well-being of the area in which they reside

will be damaged if the Telegraph Building is demolished. Consequently, the Plaintiff Historic Harrisburg Association, Inc. has shown harm to its members. An association even in the absence of injury to itself, may have standing solely as the representative of its members. *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Arguably, their complaint is within the zone of interest sought to be protected by 16 U.S.C. § 470f.

■ The Plaintiff Edward Weintraub is a director of the office of Historic Preservation for the Pennsylvania Historical and Museum Commission. The National Historical Preservation Act, 16 U.S.C. § 470 et seq. provides for state Historic Preservation Officers and assigns a role to these officers. Weintraub is the Historic Preservation Officer for the Commonwealth of Pennsylvania. Consequently, Weintraub can show that he would be injured by the demolition of the Telegraph Building and his claim is arguably within the zone of interest to be protected or regulated by the National Historical Preservation Act. In addition, Weintraub acts as parens patriae for the citizens of the Commonwealth of Pennsylvania. The Court concludes that Weintraub has standing to bring this action. *Edward Weintraub, State Historic Preservation Officer v. Provident National Bank, et al.*, Civil Action No. 78–1577 (E.D.Pa. 1978).

■ The Rural Electrification Administration contended at argument on each of the applications for temporary restraining orders that this suit must be dismissed against it because the United States was not named as a Defendant. This argument was not set forth in the brief accompanying the motion to dismiss. Consequently, the Court will deny REA's motion to dismiss on this ground. Even if the Court were to deal with that issue on the merits, it would deny the motion to dismiss. In *Cervase v. Office of the Federal Register*, 580 F.2d 1166 (3d Cir. 1978), the United States Court of Appeals for the Third Circuit held that the District Court had erred in dismissing

an action against the Office of the Federal Register because the office was not a suable entity on the ground that such a result was inconsistent with the letter and spirit of the Judicial Review Act, 5 U.S.C. § 702. The Court believes that based upon the decision of *Cervase* and 5 U.S.C. § 702, the Rural Electrification Administration is a suable entity.

█ The Defendants maintain that Plaintiffs' complaint should be dismissed because of the Plaintiffs' failure to join the Pennsylvania Rural Electric Association as a Defendant. In view of the fact that Defendants have not supported this contention in their brief, their motion to dismiss on this basis will be denied.

█ In their motion to dismiss, the Defendants challenge the Court's jurisdiction because they contend that there is no federal involvement in the demolition of the Telegraph Building and consequently 16 U.S.C. § 470f does not apply. The Court believes that this issue is at the heart of the Plaintiffs' action. It cannot be disposed of by a motion to dismiss because it presents a factual issue. The Plaintiffs in their complaint plead federal involvement. For the purposes of a motion to dismiss the Court must assume that all well-pleaded facts in the Plaintiffs' complaint are true. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Bethel v. Jendoco Construction Corporation*, 570 F.2d 1168, 1170 (3d Cir. 1978). In the light of the foregoing, the Court will deny the Defendants' motion to dismiss the Plaintiffs' complaint.

█ The Court must now determine whether the Plaintiffs have met the standards required for the issuance of a preliminary injunction. The moving party must show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured if relief is not granted. In addition, although the burden rests upon the moving party to make these two requisite showings, the District Court shall take into account when they are relevant the possibility of harm to other interested persons from the granting or denial of the injunction and (4) the public interest. *Constructors Association of Western Pennsylvania v. Kreps et al.*, 573 F.2d 811 (3d Cir. 1978); *Systems Operations v. Scientific Games Development Corporation*, 555 F.2d 1131, 1141 (3d Cir. 1977); *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975). While these factors structure the inquiry, no one aspect will necessarily determine its outcome. The district court must attempt to minimize the probable harm to legally protected interests between the time that the motion for a preliminary injunction is filed and the time of the final hearing. In a situation where factors of irreparable harm, interests of third parties and public considerations strongly favor the moving party, an injunction might be appropriate even though Plaintiffs do not demonstrate as strong a likelihood of ultimate success as would be generally required. *Constructors Association of Western Pennsylvania v. Kreps et al.*, 573 F.2d 811 (3d Cir. 1978).

█ Because the Telegraph Building is in the process of being demolished right now, the Plaintiffs have established irreparable harm if an injunction is not issued to prevent the destruction of the Telegraph Building. The public interest would be served by the preservation of the Telegraph Building. In reaching this conclusion, the Court accepts the judgment of the Secretary of the Interior concerning this building's architectural and historic value. The Defendants Telegraph Building Corporation, Association Building Corporation, and Allegheny Electric Cooperative maintain that if an injunction is granted halting the demolition of the Telegraph Building, they will suffer substantial financial losses. The financial harm that these defendants would suffer is outweighed in the Court's view by the irreparable harm that the Plaintiffs and the members of the Harrisburg community would bear if the building is demolished.

The Plaintiffs must also establish that they are likely to prevail on the merits. To meet this burden they must show that the provisions of the National Historical Preservation Act, 16 U.S.C. § 470f apply to the Telegraph Building. 16 U.S.C. § 470f re-

quires that the head of any federal agency having direct or indirect jurisdiction over a proposed federal or federally assisted undertaking in any state and the head of any federal department or independent agency having authority to license any undertaking shall prior to the approval of the expenditure of any federal funds on the undertaking or prior to the issuance of any license must take into account the effect of the undertaking on any district, site, building, structure, and object that is included in the National Register. Plaintiffs must show that the demolition of the Telegraph Building is being conducted with federal funds or that it depends upon the issuance of a license by a federal department or agency. In order to evaluate whether federal funds have been used in the demolition of the Telegraph Building or will be used in the demolition of the Telegraph Building and whether a federal license is required before demolition can proceed, the facts concerning the ownership and the destruction of the Telegraph Building must be set forth with some detail. Because the corporate acrologues are somewhat confusing, the full names with the acrologues will be used again at this point.

Allegheny Electric Cooperative (AEC) is a federation of all 12 Pennsylvania Rural Electrification Administration (REA) borrower. Sussex Rural Electric Cooperative, and one non-REA borrowers, AEC is a Pennsylvania non-profit corporation formed to allow the local cooperatives to purchase electricity on a larger wholesale basis than was possible formerly when each cooperative negotiated with private utility companies. AEC has "all-requirements" wholesale power contracts with its 14 members extending through the year 2025. Prior to January of 1978 when AEC acquired a participation interest in the Susquehanna Steam Electric Station, AEC did not own any generation or transmission facilities. Pennsylvania Rural Electrification Association (PREA) is a Pennsylvania non-profit corporation and is a coordinator or member-service organization for Pennsylvania's rural electric cooperatives. Telegraph Building Corporation (TBC) owns the Telegraph

Building. TBC is owned by Locust Court Associates, Inc. (LCA). LCA is owned by Associated Building Corporation (ABC). ABC is owned by AEC and PREA each of whom has a 50% interest. Essentially, AEC and PREA own the Telegraph Building Corporation. Parking is a problem in the area around the Locust Court Building which serves as a headquarters building for AEC. Lombardo's Restaurant which is in the building and which is owned in part by ABC is in need of parking. The purpose of the demolition of the Telegraph Building is to provide parking for the Lombardo Restaurant and the other tenants of the Locust Court Building including AEC and PREA.

According to the Plaintiffs the following facts show that federal funds are being used for the demolition of the Telegraph Building. REA provides direct loans at rates of 2% to 5% to Rural Electric Cooperatives and guarantees loans for the construction of large scale electric power plants. REA has lent and is currently lending substantial sums to all of AEC's members, with the exception of one. On August 12, 1977 REA made a commitment to guarantee a loan by the Federal Financing Bank in the amount of $241,408,000 to finance a 10% participation interest by AEC in Susquehanna Station. National Rural Utilities Cooperative Finance Corporation (CFC) a non-profit corporation which provides supplemental financing for the Rural Electrification Program provided a two-year $1,000,000 loan to AEC to build the Locust Court Building. The financing of the Locust Court Building was accomplished by a consortium of banks headed by the Commonwealth National Bank in which AEC's members maintain deposits. The purchase of the Telegraph Building was financed in part by a $120,000 mortgage provided by Consumer Life Insurance Company. This mortgage was guaranteed by AEC, PREA, and LCA. As of December 31, 1972, when AEC and PREA were attempting to secure a loan for the erection of a new headquarters building, AEC had $274,345.00 in capital and a donated capital of $6,400.00 and PREA was in a deficit position in the

amount of $16,541.00. According to the Plaintiffs, the financing of the headquarters building was made possible because of the surplus funds generated by the member cooperatives of AEC. Federal funds were responsible for the surplus, since the member cooperatives of AEC with the exception of one depend heavily on federal loans. AEC's members have as their main assets electrical transmission lines and generation equipment, which directly are funded either wholly or substantially by loans from REA. The rates charged by AEC, which are interestingly enough unregulated by either the state or the federal government, for the power it sells to its member cooperatives has allowed it to accumulate a substantial surplus of funds. This surplus has enabled AEC to lend ABC $1,300,000.00 for financing the Locust Court project, absorb ABC's accumulated deficit of $553,128.00 and pay off within a two-year period from 1976 to 1978 the loan of $1,000,000 that AEC received from CFC for financing the Locust Court project. All of the REA-borrower-member cooperatives and AEC enjoy a nonprofit tax-exempt status pursuant to § 501(c)(12) of the Internal Revenue Code. AEC purchases a large percentage of its power from the Power Authority of the State of New York whose rates per kilowatt hour are low because the electricity is hydroelectricity generated by the natural waterfall at Niagara, New York. AEC is permitted to buy electricity from the power authority of the State of New York pursuant to criteria set forth by an Act of Congress, 16 U.S.C. § 836. Less than 10% of AEC's power needs for 1976 were purchased from investor-owned utilities at a rate of $1.81 per kilowatt hour. Approximately 33% of AEC's power needs for 1976 were purchased at a rate of $3.63 per kilowatt hour. 50% of its power needs for 1976 were purchased from the power authority of the State of New York at a rate of $.59 per kilowatt hour. AEC had only $41,981.00 in its utility plant until 1977 when it became an REA borrower. AEC now has a utility plant of at least $88,998,454.00 as a direct result of an REA loan guarantee.

No federal funds have been directly used for or allocated to the demolition of the Telegraph Building. No federal agency intended or has authorized money for the demolition of the Telegraph Building. Plaintiffs essentially maintain that because federal funds enabled AEC to construct the Locust Building Corporation Project which created the need for parking and thus caused the proposal for the demolition of the Telegraph Building to provide that parking the demolition is a federal undertaking. Congress in the Court's view only intended to control direct federal spending for actions or projects which would otherwise destroy buildings on the National Register. Congress did not intend to reach every effect of federal spending. The interpretation of the statute advocated by the Plaintiffs would require detailed and elaborate tracing of the effects of federal funds because every action which was remotely caused three or four steps down the line by federal funding or a federal loan would be controlled by 16 U.S.C. § 470f. Nothing in the language of 16 U.S.C. § 470f or in the legislative history supports such a novel and far reaching interpretation. The statute states certain procedures must be followed before "the approval of the expenditure of any Federal funds on the undertaking." This indicates to the Court that direct federal funding of a project is required. Otherwise how could the requirements of 16 U.S.C. § 470f be met prior to the expenditure of the funds. Under the interpretation of the statute put forth by the Plaintiffs the effect of the federal funds will not be known until they are spent. State and local governments and businesses would have to expend considerable time, effort, and money to determine whether or not various projects were arguably affected by federal funds. No case has been cited to the Court by the Plaintiffs nor has one been found by the Court which has accepted such a far-reaching interpretation of 16 U.S.C. § 470f.

Instead, federal courts have found no federal action pursuant to 16 U.S.C. § 470f in the factual situations where federal spending was considerably more related to the challenged project than it is in this case.

In *Ely v. Velde*, 363 F.Supp. 277 (E.D.Va. 1973), the Plaintiffs argued that the National Historical Preservation Act, 16 U.S.C. § 470f applied where a proposed diagnostic and medical center for inmates was sought to be constructed by the Virginia Department of Welfare. Although the project was originally scheduled to be financed primarily with state funds, the Virginia Department of Welfare and Institutions applied for a total of $870,000 in federal funds pursuant to the Safe Streets Act, 42 U.S.C. § 3701 et seq. to be used in construction of the diagnostic and medical center. After the Plaintiffs had filed suit seeking to block the construction of the center because it had not conformed with the National Historic Preservation Act and after the United States Court of Appeals for the Fourth Circuit had concluded that the Law Enforcement Assistance Administration which was responsible for administering the Safe Streets Act grants was not immune from the requirements of the National Historical Preservation Act, the Commonwealth of Virginia decided to build the center without federal funds. The Department of Welfare and Institutions of Virginia submitted six subsequent applications designed to make use of the money they had originally allotted for the center. The Virginia budget was amended in 1973 to reflect the shift of federal funds from the center to these other projects. The Court held that based on these facts the Plaintiffs had not borne their burden of proving that through bookkeeping shifts the Department of Welfare and Institutions intended to fund the medical reception center directly or indirectly with federal funds. Certainly the facts in *Ely, supra* indicate a closer relationship between federal funds and the proposed project than do the facts proven by the Plaintiffs in this case. The Court concludes that no federal funds have been used or are going to be used in the demolition of the Telegraph Building. .

Plaintiffs also maintain that various regulations of the Rural Electrification Administration constitute a license as that term is used in 16 U.S.C. § 470f. REA requires that all borrowers from it receive approval of plans for the construction of a headquarters building and certain adjuncts to it such as a garage. As of January 11, 1978, AEC was a borrower of REA. The Locust Court Building is a headquarters building for AEC. The Telegraph Building is being demolished to provide parking in part for the needs of AEC and its headquarters building. Consequently, according to Plaintiffs, pursuant to the regulations of REA, REA's approval was necessary before the Telegraph Building could be demolished for a parking lot for the Locust Court Building. But this does not mean that the approval by REA is a license within the meaning of 16 U.S.C. § 470f. The Court believes that Congress intended the word "license" in that statute have its technical meaning; that is, that it refers to a written document constituting a permission or right to engage in some governmentally supervised activity. For example, the Court believes that the statute clearly applies to licenses issued to TV stations by the FCC. The legislative history supports this interpretation. Originally, 16 U.S.C. § 470f applied only to projects receiving federal funds. An amendment was added in the House of Representatives which according to the report of the House Committee on Interior and Insular Affairs expanded the requirements of 16 U.S.C. § 470f to include federal licensing agencies. U.S.Cong. & Admin.News, 1966 Page 3310. Certainly, the House Report strongly indicates that the amendment was designed to affect only federal agencies which engaged in licensing activities. Congress did not intend to affect every action which required federal approval. Consequently, the Court concludes that the regulation of REA which requires approval of headquarters buildings and their adjuncts does not provide for a license within the meaning of 16 U.S.C. § 470f. For the reasons indicated above, the Court is also of the view that the right of REA to approve and control the expenditure of surplus funds of the electric cooperatives which compose AEC does not relate to a license within the meaning of 16 U.S.C. § 470f.

In the light of the foregoing, this Court finds that demolition of the Telegraph Building is not being undertaken by federal funds nor does it require a federal license. Consequently, 16 U.S.C. § 470f does not govern the demolition of the Telegraph Building. The Plaintiffs have made at best a minimal showing that they are likely to prevail on the merits. The Plaintiffs' minimal showing is not outweighed by their meeting the other criteria for the issuance of a preliminary injunction. Their motion for a preliminary injunction must be denied on this ground. The Court believes that it is highly unlikely that Plaintiffs will prevail on the merits. The Court will place this case on the December, 1978 Harrisburg trial list for a determination as to whether a permanent injunction should be issued. Although this Court has essentially found that it has no jurisdiction of this case because 16 U.S.C. § 470f does not apply to demolition of the Telegraph Building, the Court will not dismiss this case at this time because the Plaintiffs have been required by the emergency nature of this case to prepare it in a relatively brief period of time. It is possible that the Plaintiffs will be able to establish federal funding at the time the hearing on the motion for a permanent injunction is held.

The Defendants objected at trial to the Court's consideration of any evidence of federal funding or federal control which occurred before the Telegraph Building was placed on the National Register. They base their argument on the language in the statute which states that certain requirements must be met for any district, site, building, structure, or object that is included in the National Register. In 1976, the act was amended to change that phrase to read "that is included in or eligible for inclusion in the National Register". Consequently, the Court properly considered evidence concerning federal involvement prior to the inclusion of the Telegraph Building on the National Register.

### IV. Conclusions of Law.

1. The Plaintiffs have standing to bring this action.

2. If a preliminary injunction is not issued, the Plaintiffs will suffer imminent and irreparable harm.

3. The Plaintiffs are not likely to prevail on the merits.

4. The public interest would be served by issuing a preliminary injunction halting the demolition of the Telegraph Building.

5. Any harm suffered by the Defendants from the granting of an injunction halting the demolition of the Telegraph Building would be outweighed by the harm suffered by the Plaintiffs and the community by not granting the injunction.

6. Federal funds are not being used for the demolition of the Telegraph Building and none have been allocated for that purpose.

7. The Rural Electrification Administration's right to approve construction of headquarters building of its borrowers and the adjuncts of those buildings including garages and parking lots and the right of REA to approve the use of surplus funds by electric cooperatives do not constitute the power to grant a "license" as that term is used in 16 U.S.C. § 470f.

8. The provisions of 16 U.S.C. § 470f do not apply to the Telegraph Building.