**NATIONAL TRUST FOR HISTORIC PRESERVATION, Plaintiffs,**

v.

**DEPARTMENT OF STATE, et al., Defendants.**

Civ. A. Nos. 91–0627 (HHG), 91–1101 and 91–0564.

United States District Court, District of Columbia.

April 14, 1993.

Richard B. Nettler, Robins, Kaplan, Miller & Ciresi, Washington, DC, for plaintiff Sheridan–Kalorama Historical Ass'n, et al.

David A. Doheny, Vice President and Gen. Counsel, Andrea C. Ferster, Asst. Gen. Counsel, Elizabeth S. Merritt, Associate Gen. Counsel, Stephen M. Truitt, Richard B. Nash, Jr., Pepper, Hamilton & Scheetz, Washington, DC, for plaintiff National Trust for Historic Preservation in the U.S.

Robin D. Ball, Gregory F. Van Tatenhove, Civ. Div., U.S. Dept. of Justice, Washington, DC, for Federal Defendants.

Nancy G. Dunn, Asst. Corp. Counsel, Washington, DC, for District of Columbia Foreign Missions–Board of Zoning Adjustment, et al.

Whayne S. Quin, Louis P. Robbins, Wilkes, Artis, Hedrick & Lane, Washington, DC, for intervenor-defendant Republic of Turkey.

## OPINION

HAROLD H. GREENE, District Judge.

Pending before the Court are several motions concerning the right of Republic of Turkey to demolish its existing chancery building in the District of Columbia and construct a new and larger one. Several historic preservation groups, Concerned Citizens for Kalorama, Inc., Sheridan–Kalorama Histori-

cal Association and the National Trust for Historic Preservation ("plaintiffs" or "Sheridan–Kalorama"), oppose the proposed demolition and expansion, and have moved for summary judgment. At the center of the plaintiffs' complaint is the alleged non-compliance by the Department of State and the District of Columbia Foreign Missions–Board of Zoning Adjustment ("FM–BZA" or "defendants") with the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Foreign Missions Act, 22 U.S.C. § 4301 *et seq.* Additionally, the plaintiffs charge that the FM–BZA is without jurisdiction to consider chancery requests relating to demolition and expansion.

Defendants have moved to dismiss on the ground that the Foreign Missions Act, 22 U.S.C. § 4301, *et seq.* expressly preempts all other federal statutes. Moreover, even if NEPA and NHPA are not preempted, the defendants argue, the statutes are by their own terms inapplicable.

I

The Republic of Turkey ("Turkey") owns a chancery building at 2523 Massachusetts Ave., N.W., in the District of Columbia. While the chancery itself is not a historic landmark, it is located within two overlapping historic districts. In 1988, Turkey submitted an application to the Department of State requesting permission to demolish the existing chancery and build a larger one.

Pursuant to the Foreign Missions Act, the application was sent first to the Director of the Office of Foreign Missions, within the Department of State, who had 60 days to veto or limit the proposal. 22 U.S.C. § 4305(a)(1)(A). No veto was issued. The application travelled next to the District of Columbia Foreign Missions–Board of Zoning Adjustment ("FM–BZA") which reviewed and denied it because of "the excessive size of the new structure" relative to the other structures in the historic district. FM–BZA Order, October 14, 1988 at 1.[1]

In 1990, Turkey submitted a revised proposal which downsizes the new chancery. Again the Director of Foreign Missions declined to exercise his veto power.[2] Nor did he refer the matter to the Advisory Council on Historic Preservation or prepare an Environmental Impact Statement ("EIS"). The matter was then forwarded to the FM–BZA which ultimately concluded that the new building design corrected the excessive size and met the six criteria necessary for approval in 22 U.S.C. § 4306(d).[3]

Accordingly, the FM–BZA granted Turkey permission to proceed with the chancery expansion. Shortly thereafter two citizen groups and the National Trust for Historic Preservation filed separate suits, later consolidated, challenging the permit approval.

II

Crucial to the resolution of the instant action is an understanding of the aims of Congress in enacting the Foreign Missions

---

1. The plaintiffs appealed to the District of Columbia Court of Appeals. That case has been stayed pending the outcome of this application.

2. Section 4305 authorizes the Director to restrict a foreign mission from using, or retaining, real property interests which are not acquired in accordance with the section, exceed limitations placed on real property available to the United States abroad, or as required to protect the interests of the United States. 22 U.S.C. § 4305(b).

3. Pursuant to 22 U.S.C. § 4306(d), in approving chancery alterations, the FM–BZA must consider the following factors:

(1) The international obligation of the United States the provision of adequate and secure facilities for foreign missions in the Nation's Capital.

(2) Historic preservation, as determined by the Board of Zoning Adjustment in carrying out this section; and in order to ensure compatibility with historic landmarks and districts, substantial compliance with the District of Columbia and Federal regulations governing historic preservation shall be required with respect to new construction and to demolition of or alteration to historic landmarks.

(3) The adequacy of off-street parking and the extent to which the area will be served by public transportation to reduce parking requirements . . . .

(4) The extent to which the area is capable of being adequately protected . . . .

(5) The municipal interest, as determined by the Mayor of the District of Columbia.

(6) The federal interest, as determined by the Secretary.

Act of 1982. In the statute's statement of findings and policy, Congress explained that the Act was intended to facilitate the operation of foreign missions in the United States and was designed to provide the Secretary of State with the power to control benefits given to foreign missions in order that he be able to demand commensurate treatment for United States missions abroad or to respond to specific foreign policy concerns. *See* 22 U.S.C. § 4301; 127 Cong.Rec. 6102–03 (1981).

Recognizing that the District of Columbia has the greatest number of foreign missions, Congress included a provision specifically addressing foreign mission issues in the District. *See* 22 U.S.C. § 4306. Review of the legislative history reveals congressional debate regarding the proper balance between local zoning interests and competing federal interests in controlling foreign missions. H.R.Conf.Rpt. No. 693, 97th Cong.2d Sess. (1982) at 40–41. However, while Congress attempted to be sensitive to issues of home rule, *see generally* S.Rep. No. 329, 97th Cong., 2d Sess. 40–48, the compromise ultimately worked out by the conference committee provided for a dominant federal role in awarding most benefits to foreign missions. Because the resolution of chancery issues could impact United States interests abroad, Congress was reluctant to leave such issues to the good sense and skills of local officials. S.Rep. No. 283, 97th Cong., 1st Sess. 11–12 (1981); H.R.Rep. No. 102, 97th Cong., 1st Sess., pt. 1 at 34 (1981).

The declaration of policy sweeps with a wide federal brush to include within the ambit of congressional control many chancery issues such as "the permissible scope of their activities and the location and size of their facilities." 22 U.S.C. § 4301(a). The zoning laws of the District of Columbia were left intact only to the extent that they were consistent with the Foreign Missions Act.

H.R.Conf.Rep. No. 693, 97th Cong., 2d Sess. 43; *see* 22 U.S.C. § 4306(j).

Moreover, Congress wanted to ensure expeditious resolution of chancery matters. To this end, Congress sought to avoid overlapping procedures which "virtually insure[d] that the Federal interest in providing adequate facilities for foreign missions will be frustrated." H.R.Rep. No. 102, 97th Cong., 1st Sess., pt. 1 at 36 (1981). Thus, the primacy of the FM–BZA's determinations was affirmed in section 4306(c)(3); "such determination shall not be subject to the administrative proceedings of any other agency or official." The Foreign Missions Act requires chancery issues to be resolved within six months of filing the application with the FM–BZA. 22 U.S.C. § 4306(c)(3).

The procedure for obtaining permission to make structural changes to foreign missions is as follows. Under section 4305, an applicant must first notify the Director of the Office of Foreign Missions of the chancery-related proposed action.[4] The Director has 60 days in which to deny or limit the proposed action. If, after 60 days, the Director has not notified the foreign mission that its proposal is denied, the foreign mission is free to submit the application to the FM–BZA pursuant to section 4306.[5]

In deciding whether to grant or deny an application, the FM–BZA considers six criteria, including historic preservation.[6] Any other provisions of law "applicable to the location, replacement or expansion of real property in the District of Columbia ... [apply] ... to chanceries only to the extent that they are consistent with [the Foreign Missions Act]." *Id.* at § 4306(j).

In this consolidated action, the Court considers the interplay between the Foreign Missions Act and other federal and local laws.

---

**4.** The Secretary of State has delegated his authority to confer or deny benefits to the Director of the Office of Foreign Missions. 22 U.S.C. § 4305.

**5.** The Board of Zoning Adjustment was originally created by the Act of June 20, 1988, § 7, 52 Stat. 797; D.C.Code § 5–424. The membership is

made up of federal officials or their designees and officials appointed by the Mayor. While the membership is mixed, the Board is a creature of D.C. law.

**6.** *See supra* note 3.

## III

■ As an initial matter, the Court finds that it has jurisdiction to review the Director's determination. It is well-established that there is a presumption of judicial review absent " 'clear and convincing [legislative] evidence' to the contrary." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); *see also Doe v. Casey*, 796 F.2d 1508, 1514–1517 (D.C.Cir.1986) (judicial review precluded if there is no law to apply.). The Court is not persuaded that Congress intended to insulate decisions made under the Foreign Missions Act from judicial review. Although the Act endows the Director with discretionary power as to whether to grant or deny a benefit, it does not give him discretion as to whether or not to comply with NEPA and NHPA in acting under the Foreign Missions Act. *Krueger v. Morton*, 539 F.2d 235, 239 (D.C.Cir.1976).

## IV

Summary judgment is appropriate if there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The non-moving party is given the benefit of all favorable factual inferences. *Washington–Baltimore Newspaper Guild v. Washington Post, Co.*, 621 F.Supp. 998, 1001 (D.D.C.1985). At the same time, Rule 56 places a burden on the non-moving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

As indicated, plaintiffs have moved for summary judgment alleging noncompliance by the State Department with the provisions of both NEPA and NHPA. Each statute is addressed in turn below.

## V

■ NEPA requires federal agencies undertaking "major federal actions" which are likely to "significantly affect the human environment" to take a hard look at the environmental effect of the proposed project. 42 U.S.C. § 4332(C); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976). While NEPA does not mandate any particular result, it requires the agency to follow particular procedures in its decision-making process. As part of this hard look, the agency must first prepare a environmental assessment to determine how great an effect the proposed action will have on the environment. If the agency makes a "finding of no significant impact," no additional studies are necessary. 40 C.F.R. § 1501.4(a)–(b), 1508.9. However, if the agency determines that the proposed action will have a significant impact, it must prepare an EIS to consider more fully the consequences of the proposed action, any adverse environmental effects, possible alternatives to the proposed action, and mitigating measures. 42 U.S.C. § 4332(C).

In sum, the complex requirements of NEPA are not triggered unless the Director's decision not to veto Turkey's proposal properly is characterized as a "major federal action significantly affecting the quality of the human environment." This threshold is not crossed in the instant action.

In *District of Columbia v. Schramm*, 631 F.2d 854, 862 (D.C.Cir.1980) the District of Columbia challenged the failure of the Environmental Protection Agency to prepare an EIS when declining to veto the granting of a permit under the Clean Water Act. The Court of Appeals found that EPA's decision not to exercise its veto power could not "realistically be classified as 'Federal action', much less a 'major Federal action' " for purposes of NEPA.[7] So too here.

7. Nor is the ultimate action here strongly federal in nature. The final decision is made not by the Director but by the FM–BZA, a group made up of both federal and local officials.

Nor is mere potential or ability to influence the outcome of a project a major federal action. In *Defenders of Wildlife v. Andrus,* 627 F.2d 1238, 1243 (D.C.Cir.1980) the court held that the Secretary of Interior's failure to exercise his authority under the Federal Land Policy and Management Act to close federal lands was not a federal action for purposes of NEPA. Acknowledging that the environmental consequences of inaction may be greater than the consequences of action, the court refused to read the statute's "federal action" requirement to encompass federal inaction. *Id.* The court reasoned that such a broad interpretation would make NEPA applicable to every routine agency operation, thus creating a serious administrative burden on federal agencies. Furthermore, the court found no reason to believe that Congress intended to impose NEPA obligations so extensively.

Similarly here, NEPA's requirements do not come into play absent a federal action. The failure to veto complained of is not the functional equivalent of issuing a permit. While even inaction has consequences, the Court has no reason to believe that Congress intended, with the passage of NEPA, to subject federal agencies to lawsuits not only for that which they do but also for that which they decline to do.

## VI

The analysis under NHPA runs along similar lines. NHPA is dedicated to preserving the nation's historic properties to ensure that its "legacy of cultural, educational, aesthetic, inspirational, economic, and energy benefits will be maintained ... for future generations." 16 U.S.C. § 470(b). The Act protects listed historic properties by, among other things, requiring federal agencies to factor into their decision-making any adverse effect their "undertakings" would have such property. In part, NHPA section 106 provides:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally-assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the

expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.

16 U.S.C. § 470f.

As an additional safeguard, the Federal agency must give the Advisory Council on Historic Preservation an opportunity to comment on the proposed undertaking and to suggest measures to mitigate any adverse effects caused by the project. *Id.* Subsequently, the federal agency and other interested parties, here the Republic of Turkey, should enter into a binding Memorandum Agreement which details steps to be taken to moderate any adverse effects. *See* 36 C.F.R. § 800 *et seq.*

Only if there is an "undertaking" by the federal agency do NEPA's provisions become relevant. An "undertaking" means:

> a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including
>
> (A) those carried out by or on behalf of the agency;
>
> (B) those carried out with Federal financial assistance;
>
> (C) those requiring a Federal permit, license, or approval; and
>
> (D) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

NHPA Amendments of 1992, Pub.L. No. 102–575, § 4019(a)(5) (to be codified at 16 U.S.C. § 470w(7)).

In sum, the obligation to consult with the Advisory Council is triggered in several situations. An agency having authority to license an undertaking may not issue the license absent compliance with NHPA. Actions carried out on behalf of a federal agency are subject to NHPA as are activities administered by a state or local entity pursuant to a delegation or approval by a federal agency. Likewise, an agency with jurisdiction over a federal or federally-assisted pro-

ject must comply before approving funds for it.

The last of these situations is not applicable here as no federal funding is involved. Nor do the plaintiffs contend that this activity falls into the category of actions "carried out by the agency." The question of NHPA applicability therefore turns on whether the Director's decision not to veto or otherwise limit the project can be construed as "licensing an undertaking" or, alternatively, whether the FM–BZA's decision was pursuant to a delegation by the State Department.

■ Turning to the question of whether the failure to veto can reasonably be construed as issuing a license, the court declines so expansively to interpret "license." In *Weintraub v. Rural Electrification Administration*, 457 F.Supp. 78, 92 (M.D.Pa.1978), the court ruled that the mere fact that federal funds enabled the Rural Electrification Association to build its headquarters—an action which created a need for a parking lot and thus resulted in the demolition of a building listed on the National Register of Historic Sites—was not a license. The court reasoned:

> that Congress intended the word "license" in that statute to have its technical meaning; that is it refers to a written document constituting a permission or right to engage in some governmentally supervised activity.... The legislative history supports this interpretation. Originally, 16 U.S.C. § 470f applied only to projects receiving federal funds. An amendment was added ... to include federal licensing activities.... Certainly the House Report strongly indicates that the amendment was designed to affect only federal agencies which required federal approval. Consequently, the Court concludes that the regulation of REA which requires approval of headquarters buildings and their adjuncts does not provide for a license within the meaning of 16 U.S.C. § 470f.

*Id.* at 92; *contra McMillan Park Comm. v. National Capital Planning Comm'n*, 759 F.Supp. 908 (D.D.C.1991), *rev'd on other grounds* 968 F.2d 1283 (D.C.Cir.1992).

The Court agrees that "license" is to be given a technical interpretation. In enacting NHPA, as in NEPA, Congress placed some constraints on the statute's applicability. A judicial interpretation of "license" as including not only explicit written permission but also a failure to veto a project when possible would read all limitations out of the Act. The Court declines plaintiffs' invitation to apply NHPA so broadly.

■ Applying the more narrow meaning of "license", the action of the Department of State is not a "license" as contemplated by NHPA. The State Department did not give written permission to Turkey. Nor was permission by the State Department a prerequisite to the FM–BZA's consideration of the application. Because no license was issued, the State Department was not required to comply with NHPA.

## VII

■ Plaintiffs urge an alternative method for finding the Department of State's refusal to veto the chancery proposal to be an "undertaking." The NHPA amendments of 1992 codified the holding of *Indiana Coal Council, Inc. v. Lujan*, 774 F.Supp. 1385 (D.D.C.1991). This second argument is that state permitting processes, such as that of the FM–BZA, are undertakings where the federal agency maintains a powerful oversight role or the state process is a delegation from the federal agency.

*Indiana Coal* held that state mining permits issued pursuant to the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201 *et seq.*, were federal undertakings requiring observance of NHPA. Under SMCRA, the Department of Interior has regulatory authority over surface mining permits. The federal agency may delegate this authority to a State if it finds that the State has adequate personnel and resources to enforce SMCRA's provisions. Once a state program is established, amendments to that program also must be approved by the Department of Interior. *See* 30 C.F.R. Part 730.

The situation here is quite different from the delegation of federal responsibility in *Indiana Coal.* Authority to issue permits to

relocate, replace, or expand a chancery is placed directly in the hands of the FM–BZA by the Foreign Missions Act. There is no delegation and no federal oversight role. The Foreign Missions Act itself establishes that section 4306 is "the exclusive procedure available to chanceries in the District of Columbia" and decisions made under that section are the sole responsibility of the FM–BZA. 22 U.S.C. § 4306. While it is correct that the legislative scheme has provided for the possibility of a federal role, in the form of a veto, the Department of State has declined to exercise its potential power. The legislative scheme is pervasively federal—the Act was written and passed by Congress, the State Department is given control over many important foreign mission matters, and local zoning laws are preempted if inconsistent with the Foreign Missions Act—but as to this discrete area of granting zoning permits, the ultimate decision rests with the FM–BZA, a body both parties concede is not federal. Again, there is an insufficient basis for finding this to be a federal undertaking.

### VII

Next the plaintiffs charge violation of the Executive Order 11593 which requires federal agencies to "institute procedures to assure that federal plans ... contribute to the preservation of ... non-federally-owned sites." 36 Fed.Reg. 8921 (1971). To this end, the federal agency shall "initiate measures to assure that where, as a result of a federal action ... a property listed on the National Register of Historic Places is to be substantially altered or demolished, timely steps be taken to make ... records ... of the property" and that the records are given to the Library of Congress. According to the plaintiffs, the records were neither made nor deposited in the Library of Congress.

Defendants counter that Executive Order 11593 was not intended to be judicially-enforceable by private parties. While Executive Orders may create obligations for agencies, they do not necessarily carry with them a private remedy for breach of those obligations. *In Re Surface Mining Regulation Litigation,* 627 F.2d 1346, 1357 (D.C.Cir. 1980). Executive Orders are judicially en-

forceable in private civil actions if they have "a specific foundation in congressional action," and the Order's terms and purpose evidences an intent to create a private right of action. *Id.* A cause of action may be expressly created, not the case here, or "inferred when necessary to effectuate the purpose of a statute or regulation." *National Indian Youth Council v. Andrus,* 501 F.Supp. 649, 679 (D.N.M.1980). There is little consensus as to whether Executive Order 11593 carries with it an implied right of action. *Compare Aluli v. Brown,* 437 F.Supp. 602, 609 (D.Haw.1977), *rev'd on other grounds,* 602 F.2d 876 (9th Cir.1979) (finding implied cause of action under E.O. 11593) *with National Indian Youth Council,* 501 F.Supp. at 678–79 (no cause of action under E.O. 11593).

This Court concludes that E.O. 11593 does not carry with it an implied cause of action. As explained above, such an action may be inferred when necessary to execute the purpose of a statute or regulation. In the instant case, the purposes of both statutes can be carried out without reading a right of action into the Executive Order. The provisions relied upon by plaintiffs are mirrored in the regulations promulgated under NHPA's and NEPA's authority. *See* 16 U.S.C. §§ 470, 470h–2(b); 36 C.F.R. Part 800 *et seq.* (1992); 42 U.S.C. § 4321 *et seq.;* 40 C.F.R. Part 6 *et seq.* (1992).

Indeed by its own terms, this Executive Order forecloses an action; obligations under the executive order must be "[c]onsonant with the provisions of [NHPA and NEPA]." Executive Order 11593 § 2. As explained above, the plaintiffs' suit directly under NHPA and NEPA themselves and their implementing regulations must be dismissed. Under such a circumstance, it would be inconsistent to find that the Acts and their implementing regulations do not support this action but that the executive order does. The front door having been closed, the Court declines to permit the plaintiffs to bring their suit in through the back door.

### IX

The last group of arguments advanced by plaintiffs alleges violations of the Foreign Missions Act itself. First, the complaint

charges that the FM–BZA lacked jurisdiction to consider an application to demolish the chancery. The gist of plaintiffs' theory is that section 4306, by its own terms, applies only to matters involving either a request to locate a chancery in a residential area or an "appeal of an administrative decision with respect to a chancery based in whole or in part upon any zoning map or zoning regulation." 22 U.S.C. § 4306. Expansion or demolition of an existing chancery is not encompassed by section 4306 and, therefore, the FM–BZA is without authority to consider such requests. Instead, plaintiffs assert that the Republic of Turkey is required to comply with the "Mayor's Agent for Historic Preservation" hearing and permit requirements of D.C.Law 2–144. D.C.Code § 5–1001 et seq.

 While the language of the Act and the legislative history are far from models of clarity, the Court finds that Congress did intend to endow the FM–BZA with expansive authority to consider decisions regarding not only the location but also replacement and expansion of chanceries. Read as a whole and in light of the legislative history, the Foreign Missions Act clearly empowers the FM–BZA to resolve a broad range of chancery issues including demolition and expansion.

Evidence that the Congress intended the Foreign Missions Act to cover chancery expansion and demolition is found in the first words of the Act: "the *location and size* of [foreign mission] facilities is a proper subject for Federal jurisdiction." 22 U.S.C. § 4301 (emphasis added). Indeed, section 4306, while entitled "Location in the District", goes on to clarify that the "location, *replacement, or expansion* of chanceries in the District of Columbia *shall* be subject to this section." *Id.* at § 4306(a) (emphasis added). An interpretation of the section as giving the FM–BZA jurisdiction limited to location would render the remainder of the Act nonsensical. For example, section 4306(h) grandfathers chancery rights as to "location, replacement, and expansion" granted before the Act's passage. As to such pre-established rights, the Act states that FM–BZA approval is not required. By implication, after the Act's passage, applications for expansion and de-

molition, not just location, must be submitted to the FM–BZA.

 The Court addresses next the question of whether in granting Turkey's permit application, the FM–BZA failed to comply with the requirements of the Foreign Missions Act. Criteria for assessing whether to approve an expansion application are set forth in 4306(d). Under that section, the FM–BZA must consider historic preservation, and "substantially comply" with the "District of Columbia and federal regulations governing historic preservation." 22 U.S.C. § 4306(d).

Because the demolition of the chancery would alter the character of the historic districts in which it is situated, the Court agrees that the FM–BZA was required to comply substantially with the NHPA and D.C. Historic Landmark and Historic District Protection Act.

NHPA and implementing regulations require that any agency proposing action shall: (1) identify the affected properties; (2) assess the action's effects on those properties; (3) solicit comments from the Advisory Council on Historic Preservation. 16 U.S.C. § 470f; 36 C.F.R. §§ 800.3–800.6 (1992). Substantial compliance with NHPA consists of, at the very least, referring the proposal to the Advisory Council on Historic Preservation to comment on the proposed undertaking and suggest measures to mitigate any adverse effects caused by the project. *See* 16 U.S.C. § 470f. Because no such referral was made, the Court grants summary judgment for plaintiffs on this issue. The Court emphasizes that the Foreign Mission Act requires only "substantial compliance" with NHPA. Accordingly, the chancery matter must be referred to the Advisory Council and the Historic Review Board for expeditious review. The FM–BZA must give the concerns and recommendations of that body serious consideration, but it is not bound by those recommendations. Moreover, because decisions under the Foreign Missions Act must be made within six months of the application's submission, any comments submitted pursuant to either federal or District of Columbia historic preservation law must be made well within that time frame.

**X**

On the issue of compliance with D.C. preservation law, plaintiffs concede that Turkey's application was forwarded to the District's Historic Review Preservation Board for recommendation. *See* Letter from Edward Curry, Executive Director FM–BZA, to Stephen Raiche, Director, D.C. Historic Preservation Review Board (September 25, 1990); Letter from Edward Curry, Executive Director FM–BZA, to Cassandra Sneed Ogden, Mayor's Agent For Historic Preservation, (September 26, 1990); Historic Preservation Review Board Staff Report and Recommendation of November 14, 1990 (Plntffs' Exh. O). The Historic Preservation Review Board staff commented that while the design of the proposed chancery was compatible with the historic district, the scale of the project should be reduced. Staff Report at 2. The staff recommended that the permit be denied.

According to the plaintiffs, merely forwarding the proposal to the Historic Review Board for comment falls short of "substantial compliance" with the District of Columbia Landmark and Historic Preservation Act of 1979, D.C.Law 2–144. *See* D.C.Code 5–1001. Instead, plaintiffs argue that the FM–BZA was also required to refer that matter to the Mayor's Agent for a decision regarding zoning issues. Specifically, under D.C.Law 2–144, after denial of the permit is recommended by the Historic Board, a project cannot go forward unless the Mayor's Agent determines that the development proposal is either consistent with the purposes of the law [8] or was a project of special merit. The matter was never referred to the Mayor's Agent.

On the facts before it, the Court is not able to make a determination as to whether the defendants did indeed substantially comply with D.C.Law 2–144. In particular, although the matter was referred to the Historic Review Board, it is not clear whether the Mayor's Agent plays a substantive role in the permitting process and whether the FM–BZA can be found to have substantially complied with local preservation laws in the absence of any referral to the Mayor's Agent.

Accordingly, both motions for summary judgment on this issue are denied.

*Conclusion*

For the reasons cited above, the Court dismisses plaintiffs' claims of non-compliance with NHPA and NEPA and E.O. 11593. Accordingly, Counts I, II, III, and IV in Civ. No. 91–0627, Counts II, III, IV, and V in Civ. No. 91–1101, and Counts I, II, III, and IV in Civ. No. 91–0564 are dismissed. In addition, the Court finds that the D.C.Law 2–144 is preempted by the Foreign Missions Act and accordingly dismisses Count V in Civ. No. 91–0564 and Count I in Civ. No. 91–1101. Summary judgment is granted for plaintiffs on Count VI in Civ. No. 91–0564 on the basis that the defendants failed to comply substantially with the provisions of NHPA as required by the Foreign Missions Act. On the issue of substantial compliance with local historic preservation laws, the Court denies defendants' motion to dismiss and plaintiffs' motion for summary judgment. Finally, the jurisdictional issue raised in Count VI of Civ. No. 91–1101 is also dismissed. There shall be a trial to determine whether the defendants have substantially complied with local preservation laws as required by the Foreign Missions Act.